# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **AMERIHEALTH CARITAS LOUISIANA, INC.** | |
| | **CIVIL ACTION** |
| **VERSUS** | |
| | **NO. 16-484-JWD-RLB** |
| **PROMISE HOSPITAL OF ASCENSION, INC.** | |

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 27) filed by Plaintiff AmeriHealth Caritas Louisiana, Inc. ("AmeriHealth Caritas" or "Plaintiff"). Defendant Promise Hospital of Ascension, Inc. ("PHA" or "Defendant") opposes the motion. (Doc. 31.) AmeriHealth has filed a reply. (Doc. 34.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, AmeriHealth Caritas' motion is granted. There is no dispute as to the terms of the written Agreement between the parties. Because Louisiana law requires that any contract between the parties be in writing, PHA must demonstrate a modification to the Agreement (or at least a question of material fact on the issue) through written evidence. PHA has failed to do so. As a result, the Court will enforce the plain and unambiguous language of the Agreement as written, and AmeriHealth Caritas is entitled to summary judgment in the amount of $936,777.31, plus pre- and post-judgment interest.

## I. Relevant Factual Background

### A. AmeriHealth Caritas

In 2011 and again in 2014, AmeriHealth Caritas was selected by the Louisiana Department of Health ("LDH") through a competitive bid process to provide services under the state's Medicaid managed care program currently known as Healthy Louisiana. (Statement of Uncontested Material Facts Supporting Motion for Summary Judgment ("SUMF"), Doc. 27-1 at 1; Statement of Contested Material Facts ("SCMF"), Doc. 31-1.)[1] AmeriHealth Caritas has provided managed Medicaid plan services to Louisiana for nearly six years, under contracts with LDH effective February 1, 2012. (SUMF, Doc. 27-1 at 1; SCMF, Doc. 31-1.) In order to provide these services, AmeriHealth Caritas has built its provider network by bringing in providers who had previously participated in Louisiana Medicaid and also by reaching out to other Medicaid eligible providers that were not then under contract with AmeriHealth Caritas. (SUMF, Doc. 27-1 at 1–2; SCMF, Doc. 31-1.)

### B. Negotiation of the Agreement

In 2012, as part of this process, Kelli Nolan, an AmeriHealth Caritas representative, contacted PHA in efforts to potentially recruit PHA into the AmeriHealth Caritas network. (SUMF, Doc. 27-1 at 2; SCMF, Doc. 31-1.) PHA is a wholly-owned subsidiary of Promise Healthcare, Inc. ("Promise Healthcare"), a Florida-based "specialty post-acute care health system operating 16 facilities across 8 states." (SUMF, Doc. 27-1 at 2; SCMF, Doc. 31-1.)

---

[1] Promise Hospital's SCMF disputes only three specific statements in AmeriHealth Caritas' SUMF. (*See* SCMF, Doc. 31-1). Middle District of Louisiana Local Rule 56(b) provides: "All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this Rule." M.D. La. LR 56(b). Accordingly, the Court will deem almost all of the facts in AmeriHealth Caritas' SUMF admitted for purposes of this motion. Moreover, the Court notes that PHA did not provide a single record citation to oppose any of the three facts it disputes. (*See* SCMF, Doc. 31-1.) Nevertheless, the Court will, of course, supplement its presentation of the facts with the (somewhat limited) evidence submitted by PHA, which the Court has thoroughly reviewed. (Docs. 31-1, 31-2.)

At an April 24, 2012 meeting, which appears to be the only in-person meeting between representatives of PHA and AmeriHealth Caritas relative to the Hospital Services Agreement entered into between the parties, effective June 6, 2012 (the "Agreement"), Kelli Nolan, of AmeriHealth Caritas' Provider Network Management team met with Laura Begnaud, Leslie Sherman and Trina Arcenaux of PHA. (SUMF, Doc. 27-1 at 2; SCMF, Doc. 31-1.) This meeting was a relatively brief meeting where Ms. Nolan provided basic information about AmeriHealth Caritas, and items such as specific per diem rates were not discussed. (SUMF, Doc. 27-1 at 2; SCMF, Doc. 31-1.)

Following the April 24, 2012 in-person meeting, AmeriHealth Caritas provided PHA with its standard Hospital Services Agreement for its review and consideration. (SUMF, Doc. 27-1 at 2; SCMF, Doc. 31-1.) Members of AmeriHealth Caritas' provider network management team, like Kelli Nolan, were only authorized to recruit providers into the network under the standard Hospital Services Agreement terms. (SUMF, Doc. 27-1 at 2–3; SCMF, Doc. 31-1.) Pursuant to AmeriHealth Caritas protocols, in order to deviate from the standard Hospital Services Agreement terms, the AmeriHealth Caritas provider network management team would need to obtain approval from the Market President of any proposed deviations. (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1.)

PHA's CEO, Richard Knowland, an experienced hospital executive, reviewed the proposed Hospital Services Agreement for key terms, including the rate that PHA was to be paid under the Agreement. (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1.) Had Mr. Knowland noted a key term in the contract that differed from what he thought it should be, he would have addressed it with the AmeriHealth Caritas representative. (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1.) To date and despite numerous requests for the same, no documents evidencing communications

from Mr. Knowland to an AmeriHealth Caritas representative with respect to the terms of the Agreement have been specifically identified or produced in the course of this litigation. (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1.) Mr. Knowland's supervisor, Bryan Day, Senior Vice-President of Operations for Promise Healthcare, also reviewed the Agreement, which PHA considered to be a "fairly standard agreement" prior to PHA's execution of the Agreement. (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1.)

At all times pertinent hereto, it was standard practice for PHA to have all contracts reviewed by counsel. (SUMF, Doc. 27-1 at 3–4; SCMF, Doc. 31-1.) Typically, for contracts like the Agreement at issue here, contracts were reviewed by corporate counsel for Promise Healthcare. (SUMF, Doc. 27-1 at 4; SCMF, Doc. 31-1.) Here, the Agreement was reviewed by corporate counsel after it had already been reviewed by Mr. Knowland and Mr. Day. (SUMF, Doc. 27-1 at 4; SCMF, Doc. 31-1.) Prior to approval of the Agreement, Mr. Knowland spoke to an attorney in Promise Healthcare's legal department who reviewed the Agreement for key terms, including rate. (SUMF, Doc. 27-1 at 4; SCMF, Doc. 31-1.)

Ultimately, the Agreement was approved by corporate counsel following review, and Mr. Knowland executed the Agreement on behalf of PHA on June 6, 2012. (SUMF, Doc. 27-1 at 4; SCMF, Doc. 31-1.) The Agreement was subsequently signed on behalf of AmeriHealth Caritas by Rebecca Engleman on October 15, 2012. (SUMF, Doc. 27-1 at 4; SCMF, Doc. 31-1.)

### C. Terms of the Agreement

Under the Agreement, PHA was to render services to members enrolled with AmeriHealth Caritas under the "Louisiana Medicaid Coordinated Care Networks- Prepaid Program, Medicare Advantage Program and such other programs as [AmeriHealth Caritas and providers] mutually agreed upon." (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) Under Section

3.2 of the Agreement, PHA agreed to be paid commensurate with the rates established in the "Hospital Services Payment Schedule set forth in Appendix A-1." (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) Appendix A-1 to the Agreement provides that PHA was to be compensated for Plan Benefits rendered to Members "in accordance with the terms of [the] Agreement at a rate of 100% of the published Louisiana Medicaid Fee-for- Service rate in effect on the date of service." (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.)

The Louisiana Department of Health makes the Medicaid Fee-for-Service rate in effect on the date of the service as referenced in Appendix A-1 publicly available to providers like PHA. (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) The Louisiana Medicaid Fee-for-Service fee schedules referenced in Appendix A-1 to the Agreement identify all registered Louisiana Medicaid hospital providers by Medicaid provider number, facility name and hospital type, and, for each such hospital, the fee schedule provides a rate type and indicates whether any such facility is rural. (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) The fee schedule clearly indicates that PHA is classified as a Long Term Acute Care (LTAC) hospital and its rates under the schedule are calculated as such. (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.)

Under the Agreement, PHA was to be reimbursed at 100% of the rate shown on the Medicaid Fee-for-Service schedule in effect on the date of service. During the time period at issue in the lawsuit, PHA was to be reimbursed as follows under the applicable Medicaid Fee-for-Service schedules: (a) $575.05 for LTAC services billed prior to August 1, 2012; (b) $553.77 for LTAC services billed from August 1, 2012 to February 1, 2013; and (c) $548.23 for LTAC services billed in all pertinent periods after February 1, 2013. (SUMF, Doc. 27-1 at 6; SCMF, Doc. 31-1.) Based on the Agreement and these rates, AmeriHealth Caritas asserts that, under the Louisiana Medicaid Fee-for-Service schedules in effect during the time of the charges at issue

herein, the rate that PHA was to receive varied as the Fee-for-Service schedule was updated. (SUMF, Doc. 27-1 at 5.) PHA, on the other hand, contends that the "rate that PHA was to receive" was modified by a subsequent agreement. (SCMF, Doc. 31-1 at 1.)

Under the Agreement, upon completion of the services, PHA would file a claim for payment with AmeriHealth Caritas outlining the facility's billed charges for the patient during a particular stay. (SUMF, Doc. 27-1 at 6; SCMF, Doc. 31-1.) The claim from PHA would not set forth the per diem rate payable under the Agreement. (SUMF, Doc. 27-1 at 6; SCMF, Doc. 31-1.) Upon receipt of the claims from PHA, AmeriHealth Caritas' electronic claims payment system directed payment of the rates that the logic instructed it to pay for the submitting facility. (SUMF, Doc. 27-1 at 6; SCMF, Doc. 31-1.)

### D. AmeriHealth Caritas' Alleged Overpayments to PHA

Over the period from April, 2012 to February, 2013, PHA was paid at $1,587.47 per diem for services billed; and for services from February 2013 to July of 2013 PHA was paid at a rate of $1,722.88 per diem; and for services rendered after that date, PHA was paid at a rate of $1,767.67 per diem, all roughly triple the rate set forth for LTAC providers in the applicable fee schedule. (SUMF, Doc. 27-1 at 6–7; SCMF, Doc. 31-1; AmeriHealth Caritas' Reply Brief, Doc. 34 at 3 n. 10.)

In the summer of 2013, the actuarial department for AmeriHealth Caritas discovered it had, in its opinion, overpaid certain providers. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) It was later discovered that the alleged overpayments to certain providers was due, according to AmeriHealth Caritas, to a human error that caused the incorrect Medicaid Fee-for-Service rate to be assigned to certain providers. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.)

A review of the alleged overpayments to PHA revealed that PHA was paid at the rural hospital per diem rate. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) The Louisiana Medicaid Fee-for-Service schedules identify certain providers as rural hospitals, but at no time pertinent to this lawsuit was PHA considered a rural hospital. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.)

AmeriHealth Caritas asserts that, as a result of the alleged overpayments, PHA was overpaid by a total of $936,777.31. (SUMF, Doc. 27-1 at 7.) Conversely, PHA maintains that it was paid what was due under the contract, as modified. (SCMF, Doc. 31-1.)

PHA has acknowledged that the amounts set forth in the documentation AmeriHealth Caritas sent PHA with AmeriHealth Caritas' demand were consistent with what PHA had in fact been paid by AmeriHealth Caritas. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1; Dep. of Trina Arceneaux, Doc. 27-6 at 37–40.)

Pursuant to its contract with LDH, AmeriHealth Caritas was required to recoup any amounts paid in error, including overpayments such as those it contends were made to PHA. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) Under the Agreement, PHA had an obligation to "comply with all policies and requirements set forth in the Provider Manual and the DHH Contract, for the detection and prevention of fraud and abuse." (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.)

Subsequently, AmeriHealth Caritas reached out to the providers to whom it had paid amounts in excess of the agreed to per diem rates. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) Of the providers that were allegedly overpaid, all providers (with the exception of PHA) made arrangements to repay the amounts, whether through cash payments or credits on future claims. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) AmeriHealth Caritas finds it noteworthy that Promise Healthcare's other subsidiary in Baton Rouge, Promise Hospital of Baton Rouge, Inc.,

was, according to AmeriHealth Caritas, overpaid, and Promise Hospital of Baton Rouge, Inc.,

made arrangements to satisfy the alleged overpayment amounts owed to AmeriHealth Caritas.

(SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1 at 1.)

When e-mails and phone calls by AmeriHealth Caritas to PHA made to recoup the

alleged overpayments to PHA proved unsuccessful, AmeriHealth Caritas submitted demand

letters, putting PHA on notice of the need to repay the alleged overpayments as early as August

27, 2013. (SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.) AmeriHealth Caritas submitted amicable

demand for the full amount of the alleged overpayments to PHA of $936,777.31 by letter dated

March 21, 2014, which letter was accompanied by a spreadsheet detailing the overpayments.

(SUMF, Doc. 27-1 at 7; SCMF, Doc. 31-1.)  After numerous unsuccessful efforts to recoup the

alleged overpayments, AmeriHealth Caritas retained legal counsel to assist with collection of the

overpayments to PHA, and demand for payment was made yet again on December 11, 2014.

(SUMF, Doc. 27-1 at 7–8; SCMF, Doc. 31-1.)

PHA responded to the demand by stating that it was paid at the correct rate, as it had

negotiated a higher rate than the one set forth in the fully executed Agreement between PHA and

AmeriHealth Caritas. (SUMF, Doc. 27-1 at 9; SCMF, Doc. 31-1.)   Despite numerous requests

both before and after the institution of this lawsuit, PHA has failed and/or refused to provide any

documentation to support its position that AmeriHealth Caritas had agreed to pay it any rate

other than that which was set forth in the Agreement. (SUMF, Doc. 27-1 at 9; SCMF, Doc. 31-

1.)  To date, PHA has not made any payments in satisfaction of the alleged overpayments.

(SUMF, Doc. 27-1 at 9; SCMF, Doc. 31-1.)

### E.  The Alleged Modification to the Agreement

PHA relies on depositions in support of its position that the contract was modified. Bryan Day, the Senior Vice-President of Operations for Promise Healthcare (SUMF, Doc. 27-1 at 3; SCMF, Doc. 31-1), testified that, in 2012, PHA was "licensed as an acute care hospital" but was "operating as a long term acute care hospital for Medicare patients." (Doc. 31-2 at 2.)  Day testified: "So essentially it's acute care hospital services that have a longer length of stay than a short term acute care hospital, like a traditional hospital would, but the services themselves are very similar, if not the same.  They are essentially the same." (Doc. 31-2 at 2–3.)  Day further explained that the "services that [PHA] provide[s] in any of the LTAC [hospitals] is the same service level or higher acuity level[.] . . . The acuity level in an [sic] LTAC [hospital] is generally higher than you would find at a traditional acute care hospital."  (Doc. 31-2 at 3.)  Ultimately, the "only distinction is essentially the length of stay." (Doc. 31-2 at 3.)

Day understood that PHA had not previously contracted with a Medicaid provider (Doc. 31-2 at 4–5.)  When asked if he had any knowledge of any meetings before the execution of the Agreement about the negotiation of the Agreement, Day testified that he was told by Rick Knowland that there had been a negotiation between AmeriHealth and Promise.  (Doc. 31-2 at 4.)  Day said that his "question would have been why would he . . . contract with a Medicaid provider, and [Knowland's] answer was very simply that the rate structure they came up with was very favorable for us." (Doc. 31-2 at 4.)  Day said that he "questioned what it was and [Knowland] showed [Day] a written note on the Agreement showing a rate that [Day] thought was very favorable[,] in the 14, 1,500 plus range, best that [Day] can recall." (Doc. 31-2 at 5.)  Day acknowledged that he did not know where that Agreement was located and that, while PHA has "exhausted every effort to try to find those documents," it could not. (Doc. 31-2 at 5.)

Day was asked when he first expressed the sentiment that he was not interested in Medicaid rates, and he replied: "I have had that position all along. We wouldn't do an agreement that had Medicaid rates in it." (Doc. 31-2 at 6.) A document attached to Day's deposition as an exhibit (Doc. 31-3 at 9) says that Day stated this on January 14, 2013, after the execution of the Agreement. Under this entry was a hand-written notation stating: "It had already been signed. Patrick said do not pursue countersignature – we are still getting paid." (Doc. 31-3 at 9.) Day did not know what that note meant, though he said the "Patrick" was possibly Patrick Ryan, who was Rick Knowland's successor. (Doc. 31-2 at 7.) Day also did not recognize the handwriting. (Doc. 31-2 at 7.)

Day was asked if the rate that Knowland mentioned to him was ultimately reflected in the signed Agreement. (Doc. 31-2 at 7.) Day admitted that it was not in the signed document but also said:

> I think or at least what I was told was that they had negotiated the rates to be the 1,500 or so dollars, and that those rates were being paid because we were the first facility that was contracted with AmeriHealth in the state for Medicaid, and that they were offer -- offering us acute care rates because they wanted us to take care of that patient population.

(Doc. 31-2 at 8.)

PHA also offers the corporate deposition of PHA, provided through Knowland. (Doc. 31-3.) He was asked about a conversation with Liston Radney (one of Promise's attorneys), and Knowland stated:

> Generally the . . . only thing I do remember -- because I was adamant throughout all of the negotiations about the contract rate, and we were told -- and I know that -- that -- I don't know if Kelli told Laura this or Trina this, but I was told by Laura and Trina that we were to be paid at the short-term acute-care rate, and that's what I conveyed to Liston . . .

> I was told by the representative [of AmeriHealth Caritas] multiple times that we were to be paid at the short-term acute-care rate because I was very adamant about it.

(Doc. 31-3 at 2–3.)    Knowland said he recalls having one conversation with Liston about the agreement, and in that conversation Knowland told Liston his concern about being reimbursed at the Short-Term Acute Care (STAC) rate. (Doc. 31-3 at 3.)

Knowland later testified regarding an unidentified document which states that PHA "contracted with [AmeriHealth Caritas] at the STAC[] [hospital] rate of 1587.47 rather than 575.01", and Knowland interpreted this as follows:

> On the revenue report, it would have showed a rate that corporate office would have put in, and I would have referred back to the 575.01 as to what they put into the original rate.  And based on all the information that I had talked to AmeriHealth, they were telling us it was at that -- whatever it was 1587.47.

(Doc. 31-3 at 4.)  However, though Knowland said that this was based on an e-mail exchange, Knowland admitted: "there was no independent document that . . . reflected this rate". (Doc. 31-3 at 4.)  He did say that this was based on what he "had been told by AmeriHealth representatives." (Doc. 31-3 at 5.)  When asked if he had contacted anyone at AmeriHealth Caritas "to confirm that what [he] had been told was, in fact, the rate in place", Knowland stated: "I had been assured that that's what it was, so I didn't see any reason to go any further." (Doc. 31-3 at 6.)

## II.    Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The

non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or

by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

(citations and internal quotations omitted). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of
> the witnesses, weigh the evidence, or resolve factual disputes; so long as the
> evidence in the record is such that a reasonable jury drawing all inferences in favor
> of the nonmoving party could arrive at a verdict in that party's favor, the court must
> deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations

omitted).

### III. Discussion

#### A. Parties' Arguments

##### 1. AmeriHealth Caritas' Memorandum in Support (Doc. 27-2)

AmeriHealth Caritas contends that the Agreement is clear and unambiguous and leads to

no absurd consequences. AmeriHealth Caritas maintains that the Agreement unambiguously

provides that PHA would be compensated "in accordance with Section 2.13 and the Hospital

Services Payment Schedule set forth in Appendix A-1". (Doc. 27-2 at 11.) Appendix A-1 in turn

said that PHA would be compensated "at a rate of 100% of the published Louisiana Medicaid

Fee-For-Service rate in effect on the date of service." (Doc. 27-2 at 12.) AmeriHealth Caritas

says the Medicaid Fee-For-Service rate was published and easily viewable as spreadsheets.

These documents clearly identify PHA as a LTAC provider, not as a rural hospital. These

spreadsheets also list the pay rates as: (a) $575.05 for LTAC services billed prior to August 1,

2012; (b) $553.77 for LTAC services billed from August 1, 2012 to February 1, 2013; and (c) $548.23 for LTAC services billed in all pertinent periods after February 1, 2013. (Doc. 27-3 at 37, 48, 60.) Consequently, the Agreement should, according to AmeriHealth Caritas, be enforced as written.

AmeriHealth Caritas also asserts that there was no modification or amendment to the Agreement. AmeriHealth Caritas first points to the Agreement itself, which provides that all amendments must be in writing and signed by both parties. (Doc. 27-2 at 13.) AmeriHealth Caritas states that PHA can point to no evidence of any alternate rate structure. (Doc. 27-2 at 14 (citing Doc. 27-9 at 13).)

AmeriHealth Caritas continues by emphasizing that parties are presumed by law to know the contents of their contracts. Here, PHA had two highly experienced executives and a corporate counsel that reviewed the Agreement. Thus, aside from the presumption, the record reflects that PHA performed due diligence. AmeriHealth Caritas argues that PHA cannot argue a mere mistake, as Louisiana jurisprudence recognizes that a party's "mistake regarding provisions of the contract would surely have been avoided by a simple reading of the contract" and that party's "oversight in this respect, on a contract of this magnitude, cannot be used to later suggest the contract was vitiated by that party's earlier neglect." (Doc. 27-2 at 16 (citations omitted).)

AmeriHealth Caritas next contends that the erroneous payments themselves did not constitute a modification. Under the Agreement, the only manner by which the contract could be changed was by signature and in writing, and the Agreement specifically prevents AmeriHealth Caritas from waiving its rights through a "prior failure on the part of AmeriHealth Caritas to insist that PHA accept the rates contemplated under the Agreement." (Doc. 27-2 at 16.)

AmeriHealth Caritas again asserts that the alleged overpayments were due to "human error" that affected other providers, all of whom (including Promise Hospital of Baton Rouge, Inc.) repaid AmeriHealth Caritas—except PHA.

> AmeriHealth Caritas concludes:
>
> PHA, a sophisticated business entity, after a review by two executives and corporate counsel, executed the standard hospital services agreement whereby PHA was to be paid at 100% of the Medicaid Fee-For-Service rate in effect on the date of service, which rates were readily available through LDH. PHA was overpaid due to the aforementioned human error. When AmeriHealth Caritas attempted to recoup these overpayments, PHA adopted and has maintained the wholly unsupported position that it was somehow entitled to amounts other than those provided for in the Agreement. Yet, despite the passage of over four years and the institution of this lawsuit, PHA has been unable to produce even a scintilla of evidence to support an amendment or separate contract to pay it at the higher rates received during the overpayment period. Accordingly, AmeriHealth Caritas is entitled to a return of all amounts that it paid over the proper rate(s) under the Agreement, pre and post judgment interest, as well as any other relief this Court sees fit.

(Doc. 27-2 at 17–18.)

## 2. PHA's Opposition (Doc. 31)

PHA begins by conceding that it "does not contest the language of the Agreement", but instead urges that, under Louisiana law, agreements can be orally modified, even if there is a provision saying that the modification must be in writing. PHA argues that this is ultimately a question of fact that should be left to the jury.

Elaborating, PHA states that the Agreement's requirement that amendments be in writing "creates only a . . . 'presumption' the parties did not intend to be bound by oral amendments to the Agreement." (Doc. 31 (citing La. Civ. Code art. 1947).) "However, because there is no law mandating that hospital service contracts (like the Agreement) must be in writing, well-settled law provides that [it] may be modified by a subsequent oral agreement, and parol evidence is admissible to prove the subsequent modification." *Id.* (Doc. 31 at 5 (citations omitted).)

14

According to PHA, the evidence shows that AmeriHealth Caritas made a choice to pay PHA per diem rates "in excess of the Louisiana Medicaid Fee-for-Service rates for LTAC facilities." (Doc. 31 at 6.) Specifically, PHA states that it would be compensated by the STAC rates, which are higher than the rates for LTAC facilities. (Doc. 31 at 6.) PHA says: "Critically, following the execution of the Agreement in October 2012, Promise Hospital continued to rely on AmeriHealth's representations regarding STAC *per diem* and understood that AmeriHealth knew as much—and, indeed, agreed—due to AmeriHealth's continued payment of STAC rates **after** the execution of the Agreement." (Doc. 31 at 6.) PHA again asserts that there are questions of fact here based on AmeriHealth's representations and post-October 2012 performance.

### 3. AmeriHealth Caritas' Reply (Doc. 34)

AmeriHealth Caritas responds by emphasizing that PHA failed to rebut almost all of the material facts set forth in AmeriHealth Caritas' statement of uncontested facts. AmeriHealth Caritas then re-emphasizes the key facts entitling it to summary judgment, such as the sophistication of PHA, its review of the Agreement, the clear and unambiguous language of the contract, and the fact that PHA was paid more than it should have received due to "human error."

AmeriHealth Caritas then challenges PHA's arguement that there was an oral modification. AmeriHealth Caritas attacks the deposition testimony PHA offers by stating (1) Day lacked firsthand knowledge of any negotiations with AmeriHealth Caritas, and (2) Knowland had "no in person meetings" with AmeriHealth Caritas and "did not recall any telephone conversations." (Doc. 34 at 4 (emphasis omitted).) AmeriHealth Caritas then contends that, contrary to PHA's assertions, Louisiana law—specifically La. Admin. Code 50, § 3505—requires that a managed care organization like AmeriHealth Caritas have *written* agreements with providers, so "AmeriHealth Caritas was not at liberty to modify the Agreement

orally even had it desired to do so (which it did not)." (Doc. 34 at 5.) AmeriHealth Caritas again argues that a party to a contract cannot unilaterally modify its terms, and the evidence here shows that AmeriHealth Caritas did not consent to any modification through payments made in error.

Lastly, AmeriHealth Caritas attacks PHA's argument that it was reimbursed at the STAC rate, explaining: "The trouble with this position is two-fold: (1) there is no STAC rate in the published Medicaid Fee for Service schedules that provide the reimbursement rates under the Agreement; and (2) even assuming, *arguendo*, that PHA's contention is actually that it was to receive the Acute rate as opposed to the Long Term Acute Care rate, this rate is actually ***less than the LTAC rate for the pertinent time period***." (Doc. 34 at 5 (emphasis in original).) AmeriHealth Caritas notes: "The reimbursement rate for designated rural hospitals providing acute care (the rate at which the uncontroverted facts show PHA was erroneously paid) is considerably higher than the Acute or LTAC rates for the pertinent time period." (Doc. 34 at 5.) PHA does not argue that it contracted to be compensated at the rural hospital rate or that it's a rural hospital. AmeriHealth Caritas concludes: "PHA's contention that it contracted reimbursement at the non-existent 'STAC rate' cannot establish an alternate fee agreement, and thus does not present an issue of material fact." (Doc. 34 at 6.)

### B. Analysis

#### 1. Interpretation of the Agreement

The parties agree that Louisiana law governs this controversy. Under Louisiana law, "[c]ontracts have the effect of law for the parties[.]" La. Civ. Code art. 1983. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045.

"When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "Under this Article, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under pretext of pursuing its spirit." La. Civ. Code art. 2046, cmt. (b) (citing *Maloney v. Oak Builders, Inc.*, 256 La. 85, 235 So. 2d 386 (La. 1970)).

A few other principles of interpretation are worth noting. "The words of a contract must be given their generally prevailing meaning." La. Civ. Code art. 2047. "Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." *Id.* "Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract." La. Civ. Code art. 2050.

"Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tex. Meridian Res. Expl. Inc.*, 180 F.3d 664, 668 (5th Cir. 1999) (citing *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998)). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Id.* at 669.

Here, the undisputed facts support AmeriHealth Caritas' interpretation of the Agreement. Under Section 3.2 of that contract, PHA agreed to be paid commensurate with the rates established in the "Hospital Services Payment Schedule set forth in Appendix A-1." (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) Appendix A-1 to the Agreement provided that PHA was to be compensated for Plan Benefits rendered to Members "in accordance with the terms of [the] Agreement at a rate of 100% of the published Louisiana Medicaid Fee-for- Service rate in effect on the date of service." (SUMF, Doc. 27-1 at 5; SCMF, Doc. 31-1.) The Court finds that these

provisions are clear and unambiguous, and PHA does not seriously dispute that. (Doc. 31 at 3 ("Promise Hospital does not contest the language of the Agreement.").

It is also undisputed what PHA was supposed to be paid under the plain language of the fee schedules referenced in the Agreement. Specifically, during the time period at issue in the lawsuit, PHA was to be reimbursed as follows under the applicable Medicaid Fee-for-Service schedules: (a) $575.05 for LTAC services billed prior to August 1, 2012; (b) $553.77 for LTAC services billed from August 1, 2012 to February 1, 2013; and (c) $548.23 for LTAC services billed in all pertinent periods after February 1, 2013. (SUMF, Doc. 27-1 at 6; SCMF, Doc. 31-1.) Instead, over the period from April, 2012 to February, 2013, PHA was paid at $1,587.47 for services billed; for services from February 2013 to July of 2013, PHA was paid at a rate of $1,722.88; and for services rendered after that date, PHA was paid at a rate of $1,767.67, about triple the rate set forth for LTAC providers in the applicable fee schedule. (SUMF, Doc. 27-1 at 6–7; SCMF, Doc. 31-1; AmeriHealth Caritas' Reply Brief, Doc. 34 at 3 n. 10.) Thus, the uncontested facts show that, if the plain terms of the Agreement are enforced, PHA was overpaid by a total of $936,777.31 (SUMF, Doc. 27-1 at 7), and AmeriHealth Caritas would be entitled to summary judgment in that amount.

### 2. Modification

But, the central question in this motion is whether, drawing all inferences in PHA's favor, a reasonable jury could conclude that PHA met its burden of proving a modification to the Agreement. In short, the Court finds that it has not.

"A contract is formed by the consent of the parties established through offer and acceptance." La. Civ. Code art. 1927. "Unless the law prescribes a certain formality for the intended contact, offer and acceptance may be made orally, in writing, or by action or inaction

that under the circumstances is clearly indicative of consent." *Id.* "This Article reflects the view of the Louisiana jurisprudence that when special formalities are prescribed for a contract the same formalities are required for an offer or acceptance intended to form that contract." La. Civ. Code art. 1927, cmt. (b) (citing *Barchus v. Johnson*, 151 La. 985, 92 So. 566 (La. 1922); *Charbonnet v. Ochsner*, 258 La. 507, 246 So. 2d 844 (La. 1971)).

Further, the party asserting modification of an obligation must prove the facts or acts giving rise to the modification by a preponderance of the evidence. La. Civ. Code art. 1831; *Cajun Constructors, Inc. v. Fleming Constr. Co., Inc.*, 2005-2003 (La. App. 1 Cir. 11/15/06); 951 So. 2d 208, 214 (citations omitted); *Monroe v. Physicians Behavioral Hosp., LLC,* 49,248 (La. App. 2 Cir. 8/13/14); 147 So. 3d 787, 796 (citations omitted). "[A] contract may be modified by mutual consent. While modification can be presumed by silence, inaction, or implication, one person may not change the terms unilaterally." *Cajun Constructors*, 951 So. 2d at 214; *see also* La. Civ. Code art. 1831; *Monroe*, 147 So. 3d at 796 (citations omitted).

Additionally, while "[t]estimonial or other evidence may not be admitted to negate or vary the contents of . . . an act under private signature[,] [n]evertheless, in the interest of justice, that evidence may be admitted . . . to prove that the written act was modified by a subsequent and valid oral agreement." *Id.* Accordingly, "[w]hen the underlying contract is not required to be in writing, it may be modified by a subsequent oral agreement, and parol evidence is admissible to prove the subsequent modification." *Monroe,* 147 So. 3d at 795–96 (collecting cases). "Even underlying contracts which contain provisions specifying that the contract may only be modified in writing may be subsequently modified by oral agreement." *Id.* (collecting cases).

Nevertheless, as the above rule provides, "such verbal amendments *only* apply to contracts that are not required to be in writing." *Bernard v. Grefer*, No. 14-887, 2015 WL

1781674, at *7 (E.D. La. Apr. 20, 2015) (citing *Salley v. Louviere*, 183 La. 92, 98, 162 So. 811,

813 (La. 1935); *Monroe*; 147 So.3d at 797; Peter S. Title, Exception to General Rule—

Modification of Contracts, La. Prac. Real Est. § 7:47, (2d ed.)).  So, for example, in *Roskind v.*

*Professional Risk Management Services, Inc.*, No. 90-2693, 1992 WL 95936 (E.D. La. Apr. 29,

1992), the district court refused to uphold an alleged oral agreement to an insurance policy

because a statute required modifications to be in writing. *Id.* at *2; *see also Bernard*, 2015 WL

1781674, at *7, *9 (finding that a party's alleged statements were "inadmissible parol evidence

to prove a contract modification because such modifications [to settlement agreements] must be

in writing", and holding that "[e]vidence that [defendant] chose to settle with some 'new'

claimants does not modify the contract because any modification had to be in writing pursuant to

Louisiana law").

This principle is reflected in the Civil Code.  Aside from Article 1927 (quoted above),

Article 1947 provides: "When, *in the absence of a legal requirement*, the parties have

contemplated a certain form, it is presumed that they do not intend to be bound until the contract

is executed in that form." La. Civ. Code art. 1947 (emphasis added). Similarly, "[w]hen the law

requires a contract to be in written form, the contract may not be proved by testimony or by

presumption, unless the written instrument has been destroyed, lost, or stolen." La. Civ. Code art.

1832.  "The dominant principle in this matter of documentary proof is that where a writing is

required for the validity of an act, that act may not be proved by any other means." La. Civ. Code

art. 1832, cmt. (b) (citing *Triangle Farms v. Harvey*, 178 La. 559, 152 So. 124 (La. 1934); 7

Planiol et Ripert, Traite pratique de droit civil francais 974–75 (2nd ed. Esmein 1954)).

Here, the contract between AmeriHealth Caritas and PHA was required by Louisiana law

to be in writing.  Specifically, the Louisiana Administrative Code provisions governing managed

care organizations and Medicaid states in relevant part: "The MCO must maintain and monitor a provider network that is supported by *written agreements* and is sufficient to provide adequate access of healthcare to enrollees as required by federal law and the terms as set forth in the contract." La. Admin. Code tit. 50, § 3505(A) (emphasis added). Thus, under the above rules, PHA cannot prove a modification solely through Day's testimony and PHA's corporate deposition.

Here, PHA has failed to meet its burden of proving a modification through written evidence. PHA submits only one document with its opposition, and it was attached to Day's deposition. (Doc. 31-3 at 9.) This piece of paper has the following typed entry: "1/14/2013 Bryan stated he is not interested in Medicaid rates." (Doc. 31-3 at 9.) The evidence then has a handwritten note saying: "It had already been signed . . . Patrick said do not pursue counter signature – we are still getting paid." But, with respect to the handwritten note, Day testified that he did not know what that note meant and he did not recognize the handwriting. (Doc. 31-2 at 7.) Moreover, even if the Court were to consider this handwritten note, the Court finds that, drawing all inferences in PHA's favor, a reasonable jury could not find from these few statements that there was mutual consent necessary to alter the written Agreement.

This finding is supported by other summary judgment evidence. Knowland admitted in PHA's Rule 30(b)(6) deposition that, despite AmeriHealth's alleged representations that PHA would be paid at a higher rate, "there was no independent document that . . .reflected this rate". (Doc. 31-3 at 4.) Further, PHA does not dispute the following statement made in AmeriHealth Caritas' SUMF: "Despite numerous requests both before and after the institution of this lawsuit, PHA has failed and/or refused to provide any documentation to support its position that AmeriHealth Caritas had agreed to pay it any rate other than that which was set forth in the

Agreement." (SUMF, Doc. 27-1 at 9; SCMF, Doc. 31-1.)  These admissions confirm that PHA has no documentary evidence demonstrating any sort of a modification to the Agreement. Without documentary proof, PHA cannot defeat AmeriHealth Caritas' motion.

In sum, PHA has failed to sustain its burden of showing that there is a genuine issue of material fact   As a result, summary judgment for AmeriHealth Caritas is warranted.

### 3. Interest

AmeriHealth Caritas requested pre- and post-judgment interest.  In short, AmeriHealth Caritas is entitled to both.

Specifically, La. Civ. Code art. 2000 provides in relevant part:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more.

*Id.*  Thus, AmeriHealth Caritas can recover pre-judgment interest.

Further, 28 U.S.C. § 1961 provides in relevant part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court."  Thus, AmeriHealth Caritas is allowed post-judgment interest.

### IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 27) filed by Plaintiff

AmeriHealth Caritas Louisiana, Inc. is **GRANTED** and that summary judgment shall be

rendered in favor of AmeriHealth Caritas and against Promise Hospital of Ascension, Inc., in the

amount of $936,777.31, plus pre- and post- judgment interest.

Signed in Baton Rouge, Louisiana, on <u>March 16, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**